# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

UNITED STATES OF AMERICA    :
:
:    CRIMINAL ACTION FILE NO.
v.                  :    1:21-cr-00076-SDG-RGV
:
:
ANTONIO JAMAR LASTER    :

## MAGISTRATE JUDGE'S REPORT, RECOMMENDATION, AND ORDER

Defendant Antonio Jamar Laster ("Laster") is charged in a two-count indictment with conspiracy to knowingly and intentionally possess with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846, and with knowingly and intentionally attempting to possess with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846. [Doc. 70].[1] After the extended deadline for filing motions had passed, see [Doc. 81], Laster filed a motion to suppress statements, [Doc. 85], a motion to suppress evidence, [Doc. 86], and a motion to show cause of delay, [Doc. 87], all of which the government opposes, [Docs. 88, 90, & 95]. For the reasons that follow, the undersigned finds

---

[1] The indictment also contains a forfeiture provision pursuant to 21 U.S.C. § 853. [Doc. 70 at 2-4]. The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

that Laster has not shown good cause for the untimely filing of his motions to suppress, so his motion to show cause of delay, [Doc. 87], is **DENIED**, and it is **RECOMMENDED** that his motions to suppress statements and evidence, [Docs. 85 & 86], be **DENIED** as untimely, and alternatively, for lack of merit.

## I.    FACTS AND PROCEDURAL HISTORY

On October 9, 2020, law enforcement agents of Homeland Security Investigations ("HSI"), who were conducting surveillance of a house in Marietta, Georgia, as part of a joint investigation of methamphetamine trafficking with agents of the Georgia Bureau of Investigation ("GBI"), observed two Hispanic males leave the house driving a Toyota Yaris, proceed to a grocery store parking lot at 3595 Canton Road in Marietta, park directly beside a Volvo sedan and hand to the driver of the Volvo a black plastic bag.  [Doc. 88-1 at 12-13].[2]  The driver of the Volvo placed the black plastic bag in the trunk of the vehicle.  [Id. at 13].  The Yaris departed the parking lot immediately after the exchange, and agents later observed that it returned to the house under surveillance.  [Id.].  About ten minutes

---

[2] The facts are drawn from the affidavit submitted in support of the October 9, 2020, search warrant, [Doc. 88-1 at 9-15], the body-worn video camera footage of the encounter with Laster on that date, [Docs. 95-1 & 95-2], and the reports of investigation produced in discovery, [Doc. 88-1 at 2-7], to which Laster had no objection, see [Doc. 94 at 22-25].  Laster did not request an evidentiary hearing in his motions to suppress, see [Docs. 85 & 86], nor is one warranted on the stipulated record in this case.

after the exchange, the Volvo departed the parking lot and subsequently was stopped for a traffic violation.  [Id.].  The driver of the Volvo consented to a search of the vehicle and law enforcement agents found inside the trunk a black plastic bag containing a kilogram of methamphetamine.  [Id. at 13-14].  The driver waived her Miranda[3] rights and agreed to speak with law enforcement agents, and she stated that she traveled to the grocery store on Canton Road in Marietta to pick up a "brick" of methamphetamine which two Hispanic males in a dark colored car gave to her in the parking lot.  [Id. at 14 (internal marks omitted)].

While conducting surveillance at the house in Marietta on October 9, 2020, agents observed the Yaris and another vehicle, a Toyota Camry, parked there, and the Camry departed the house later that afternoon and traveled to Cherokee County.[4]  [Id. at 13-14].  Agents followed the Camry, which was occupied by two Hispanic males, as it proceeded north on Canton Road to a parking lot at 9740 Main Street, Woodstock, Georgia, where it pulled into a parking space next to a blue Nissan Sentra that had a Tennessee license plate.  [Id. at 5, 14].  Believing that a narcotics transaction was underway, GBI Special Agent in Charge Ken Howard

_____

[3] See Miranda v. Arizona, 384 U.S. 436 (1966).

[4] The Camry was familiar to agents because it had been used to deliver methamphetamine to an undercover agent's car during a controlled buy in a parking lot along Canton Road in Marietta in September 2020, similar to the transaction between the Yaris and Volvo on October 9.  [Doc. 88-1 at 11-14].

("Agent Howard"), one of the agents who had followed the Camry after it departed the house under surveillance in Marietta, [id. at 5], approached the driver's side of the Camry and observed the passenger was holding a plastic grocery bag in his lap that Agent Howard suspected contained methamphetamine, [id. at 5, 14]. HSI Special Agents John Cwieka and Timothy Everhart approached the passenger side of the Camry and immediately saw another bag on the front passenger floorboard between the passenger's feet that they recognized contained methamphetamine. [Id.]. The two occupants of the Camry were removed from the vehicle and placed in handcuffs. [Id. at 5].

Agent Howard then turned to the driver of the Sentra that was parked next to the Camry and identified himself as a law enforcement officer and told the driver, later identified as defendant Laster, that he suspected Laster was involved in a drug transaction with the individuals in the Camry. [Id. at 14]. Agent Howard obtained Laster's driver's license and an identification card from a passenger seated in the Sentra, handed them to Woodstock Police Department Officer Barron Dixon ("Officer Dixon"), who was on the scene, and asked him to run them for warrants and any criminal history for drugs. [Doc. 95-1 at 00:30-00:37].[5] Agent Howard then returned to the Sentra, accompanied by Officer Javardia Wynn of

---

[5] Officer Dixon had a body-worn video camera that recorded the encounter with Laster and others in the parking lot on October 9, 2020. See [Doc. 95-1].

the Woodstock Police Department, who also had a body-worn video camera that recorded the encounter, see [Doc. 95-2], and he asked Laster to exit the vehicle and step to the rear to speak with him.  See [id. at 01:12-01:17].  Laster complied with the request and walked to the rear of the Sentra where he stood and spoke with Agent Howard for a few minutes.  See [id. at 01:20-04:30].  Agent Howard frisked Laster for weapons, [id. at 01:40-01:47], and asked him to remove his hands from his pockets as they were talking, [id. at 01:55-02:02], but Laster was not handcuffed or otherwise physically restrained in any manner during this conversation with Agent Howard at the rear of his vehicle, [id. at 01:20-04:30].

Agent Howard explained to Laster why he suspected that he was involved in a drug deal with the two Hispanic males in the Camry based on the investigation, [id. at 01:48-02:50], but Laster denied that he was there to acquire drugs, [id. at 02:42-02:45, 03:10-03:16].  Instead, Laster said that he was traveling from Tennessee to Atlanta when he stopped to ask for directions from the individual who was seated as a passenger in his vehicle, [id. at 02:50-02:55], and he denied knowing that individual or the two males in the Camry, [id. at 03:45-03:50].  Agent Howard asked Laster if he had any drugs, weapons, or large sums of money in the Sentra, which Laster denied.  [Id. at 04:02-04:06].  Agent Howard then requested consent to search his vehicle, but Laster declined.  [Id. at 04:07-04:15].  Agent Howard asked if the Woodstock Police Department had a K-9 unit

5

on duty, [id. at 04:17-04:27], and Officer Dixon requested the K-9 officer on call to come to the scene, but he was not available, [Doc. 95-1 at 05:35-07:40], so he contacted other nearby jurisdictions requesting a K-9 unit, [id. at 07:44-07:55, 13:44-14:00].

While waiting on a K-9 officer to arrive, Agent Howard stepped away from Laster to speak with the individual who had been seated in the Sentra with Laster, [Doc. 95-2 at 04:35], and other officers and agents remained near Laster, who stood unrestrained at the rear of his vehicle for another approximately 20 minutes as agents continued their investigation at the scene.[6]  [Doc. 95-1 at 05:30-23:10; Doc. 95-2 at 04:35-25:20].  The  individual who had been seated in the passenger seat of Laster's vehicle when Agent Howard approached the Sentra told agents that he did not know Laster and had just met him and was asking him for a job, [Doc. 88-1 at 14], but he subsequently told agents that Laster was in the parking lot to buy $21,000 of drugs from the occupants of the Camry, [id. at 6, 14-15].

After speaking with the passenger in the Sentra, Agent Howard returned to Laster and told him that he had requested a K-9 unit and that he was applying for a search warrant for the Sentra so Laster had to remain out of the vehicle.  [Doc.

---

[6] The Woodstock police officers who had body-worn video cameras stood near Laster while he was out of his vehicle and occasionally conversed with him.  [Docs. 95-1 & 95-2].

95-1 at 16:00-17:07].  Agent Howard asked the Woodstock police officers to wait with Laster who remained unrestrained, standing at the rear of the vehicle.  [Id. at 17:08-17:16].  Either Officer Dixon or two to three other officers stood in the vicinity of Laster for the remainder of the encounter in the parking lot, but Laster was not handcuffed or otherwise restrained during this time.  [Id. at 17:16-44:15].  A Cherokee County Sheriff's Office K-9 officer arrived on the scene approximately 25 minutes after Agent Howard had first approached Laster.  [Doc. 88-1 at 14; Doc. 95-1 at 23:30].  Laster was asked to step away from the Sentra so the K-9 could be deployed around the vehicle, and he stood next to an unmarked law enforcement vehicle nearby.  [Doc. 95-1 at 25:15-25:30].  The K-9 circled the Sentra and alerted to the presence of narcotics odor from within the vehicle.  [Doc. 88-1 at 14; Doc. 95-1 at 26:15-27:05].

Agent Howard returned to where Laster was waiting and told him that the K-9 gave a positive alert for the Sentra, and he informed Laster that he was waiting for a search warrant for the vehicle.  [Doc. 95-1 at 30:18-30:50].  Approximately 17 minutes after the K-9 alert, Officer Dixon placed Laster in handcuffs and told him that he was not under arrest but was being detained, [id. at 44:15-44:40], and he put Laster in a marked patrol vehicle, [id. at 45:35-47:14].  Approximately five minutes later, Officer Dixon informed Laster that he was under arrest for methamphetamine trafficking, [id. at 52:35-52:55], moved him to his patrol vehicle,

[id. at 52:35-55:12], and transported him to the Cherokee County Sheriff's Office, [id. at 1:01:25-1:22:50].  Agents subsequently obtained a state search warrant for the Sentra, [Doc. 88-1 at 8], and seized $23,100 in United States currency and multiple cell phones from the vehicle, [id. at 6].  A second state search warrant for the Sentra was obtained and executed on October 19, 2020, [Doc. 88-2 at 34], but it did not result in the seizure of any evidence, [id. at 7-8].

On February 23, 2021, a federal grand jury returned a two-count indictment against Laster.  [Doc. 70].  Laster was arraigned on March 9, 2021, [Doc.  77], and the Court issued a pretrial scheduling order, requiring pretrial motions to be filed before a March 25, 2021, pretrial conference, [Doc. 79].  Laster sought and was granted an extension of time until April 12, 2021, to file pretrial motions, and the pretrial conference was continued until April 13, 2021.  [Docs. 80 & 81].  Laster did not file any pretrial motions by the extended deadline, but during the pretrial conference, see [Doc. 82], Laster complained that he believed that discovery production was incomplete because he had not received any reports from the Cherokee County Sheriff's Office regarding the events on October 9, 2020, and he requested that the prosecutor confirm that there were no further records to be produced and orally sought an extension of time to file pretrial motions, see [id.]. The Court granted Laster until April 30, 2021, to file pretrial motions but required that "[i]f additional pretrial motions [were] filed, [he] must indicate why the

motions could not have been filed by the previously extended deadline of April 12, 2021." [Id.].  Laster's counsel confirmed that he understood he would need to show good cause for filing any motions.  See [Doc. 94 at 5-7, 24].

Following the pretrial conference, the prosecutor learned that the Cherokee Multi-Agency Narcotics Squad ("CMANS") that had participated in the methamphetamine trafficking investigation with the GBI and HSI had not turned over to HSI approximately one dozen pages of reports pertaining to the arrests made and evidence seized on October 9, 2020, as well as additional reports and documents pertaining to the second search warrant for the Sentra that was executed on October 19, 2020.  [Doc. 88 at 5-6; Doc. 88-2].  The government made a production of supplemental discovery to Laster on April 20, 2021, consisting of approximately 65 pages of these documents.  [Doc. 88 at 5-6; Doc. 88-2].  On April 30, 2021, Laster filed a motion to suppress statements, [Doc. 85], and a motion to suppress evidence, [Doc. 86], as well as a motion to show cause of delay, [Doc. 87], asserting that "[w]ithout possession or knowledge of the exact details of the [CMANS] investigation, [] [he] did not have sufficient information of all relevant facts to make a reasonable determination of the propriety of filing pre-trial motions at the time of [the] April 12, 2021," extended deadline for filing pretrial motions, [Doc. 87 at 3].  The government opposes Laster's motions to suppress as untimely, [Doc. 88], and on their merits, [Doc. 95], and contends that he has not established

good cause to excuse the untimely filing of his motions to suppress, [Docs. 88 & 90].  For the reasons that follow, the Court concludes that Laster has not shown good cause for the untimely filing of his motions to suppress, so his motion to show cause of delay, [Doc. 87], is **DENIED**, and alternatively, it is **RECOMMENDED** that his motions to suppress evidence and statements, [Docs. 85 & 86], be **DENIED**.

## II.    DISCUSSION

### A.    <u>Motion to Show Cause of Delay, [Doc. 87]</u>

Pursuant to Federal Rule of Criminal Procedure 12(c), "[t]he court may . . . set a deadline for the parties to make pretrial motions," and "[i]f a party does not meet the deadline for making a Rule 12(b)(3) motion, the motion is untimely."  Fed. R. Crim. P. 12(c)(1), (3); <u>see also</u> LCrR 12.1(B), NDGa. ("Motions filed in criminal proceedings shall be filed with the clerk within fourteen (14) days after arraignment.  A magistrate judge may for good cause extend the filing time for one fourteen (14)-day period.").  "A defendant who fails to file his motion within the deadlines set by the court waives his right to assert this motion," but "this waiver may be excused for good cause."  <u>United States v. Atkins</u>, 702 F. App'x 890, 894 (11th Cir. 2017) (per curiam) (unpublished) (alterations, citations, and internal marks omitted); <u>see also</u> <u>United States v. Lawrence</u>, CRIMINAL ACTION NO. 1:17-cr-00126-LMM-CMS, 2019 WL 3006620, at *1 (N.D. Ga. Mar. 14, 2019),

adopted by 2019 WL 2184818, at *3 (N.D. Ga. May 21, 2019) (citations omitted);

United States v. Petite, CRIMINAL NO. 16-00161-CG-B, 2017 WL 1352223, at *1

(S.D. Ala. Apr. 7, 2017) (citation and internal marks omitted) ("Good cause is a

flexible standard that requires consideration of all interests in the particular

case."). However, "[a] defendant does not have good cause warranting relief from

waiver when he had all the information necessary to bring a 12(b) motion before

the date set for pretrial motions." United States v. Searcy, 278 F. App'x 979, 981

(11th Cir. 2008) (per curiam) (unpublished) (citation omitted).

The Court extended the original deadline for filing pretrial motions upon

Laster's request, [Doc. 80], setting a new deadline of April 12, 2021, [Doc. 81].

Laster did not file any motions by the extended deadline, but at the pretrial

conference on April 13, 2021, his counsel orally requested another extension of

time to file motions based on his belief that discovery production was incomplete.

See [Doc. 82]. The Court granted Laster's request, but required that "[i]f additional

pretrial motions [were] filed, [he] must indicate why the motions could not have

been filed by the previously extended deadline of April 12, 2021." [Id.]. Laster's

counsel acknowledged at the pretrial conference on April 13, 2021, and again

during a telephone conference on May 14, 2021, that he was required to show good

cause for filing motions after the April 12, 2021, deadline set by the Court, [Doc.

94 at 5-7, 24]; see also [Docs. 82 & 93], and he attempted to do so in his motion to

show cause of delay, [Doc. 87], and during the telephone conference regarding his motion, [Doc. 94 at 8-24].  However, having considered the parties' arguments and the record in this case, the undersigned finds that Laster has not shown good cause for the untimely filing of his motions to suppress because, although the government produced supplemental discovery on April 20, 2021, <u>see</u> [Doc. 88 at 5-6 & n.2; Doc. 88-2], after the extended deadline for filing pretrial motions had passed, Laster has not shown that his motions to suppress relied on the information produced in the supplemental discovery and could not have been filed within the extended deadline based on the discovery the government had already produced in the case, <u>see, e.g.,</u> [Doc. 88-1; Doc. 96].  The Court need not discuss in detail the arguments advanced by the government demonstrating that Laster had all the information required to file his motions to suppress well before the extended deadline for filing motions of April 12, 2021, <u>see</u> [Doc. 88 at 7-11; Doc. 88-1; Docs. 95-1, 95-2, & 95-3; Doc. 96],[7] but finds those arguments persuasive in

---

[7] The government demonstrated that Laster's motions to suppress relied on facts available in reports of investigation and the October 9, 2020, search warrant application produced in discovery on March 15, 2021, [Doc. 88 at 8-9; Doc. 88-1], and that other factual representations in his motions were refuted by body-worn video camera footage of the October 9, 2020, encounter that also was produced to him on March 15, 2021, [Doc. 88 at 10; Doc. 88-3; Doc. 95].  The only allegation in either motion that was based on the supplemental discovery production was that CMANS obtained a "second search warrant . . . for a search of the blue Nissan Sentra's gas tank" on October 19, 2020.  [Doc. 86 at 3 ¶ 4].  However, as the government explained, agents did not obtain any evidence from that second

concluding that Laster has not shown good cause for the untimely filing of his motions to suppress, particularly since Laster's counsel acknowledged that he could not identify anything within the supplemental discovery production from Cherokee County that he did not have that was necessary to file the motions to suppress, [Doc. 94 at 11-12]. "A defendant does not have good cause warranting relief from waiver when he had all the information necessary to bring a 12(b) motion before the date set for pretrial motions." Searcy, 278 F. App'x at 981 (citation omitted). Accordingly, because Laster has failed to identify good cause for the untimely filing of his pending motions to suppress, [Docs. 85 & 86], after the extended deadline, his motion to show cause for delay, [Doc. 87], is **DENIED**, see United States v. Mwangi, Criminal File No. 1:09-CR-107-TWT, 2010 WL 690136, at *3-4 (N.D. Ga. Feb. 18, 2010), adopted at *1 (denying defendant's motion for leave to file various motions because "[a] review of the underlying motions for which [he sought] to file indicate[d] that the facts and information upon which these motions [were] based were known to [] [him] well before he filed the motions"). Alternatively, although Laster's motions to suppress, [Docs. 85 & 86], are untimely, this Report and Recommendation will address the merits of the

---

search warrant, [Doc. 88-2 at 7-8], so there is nothing to move to suppress with respect to the October 19, 2020, search.

motions on the stipulated record to provide complete consideration of the motions by the District Judge.

### B.   **Motion to Suppress Statements, [Doc. 85]**

Laster moves to suppress all statements obtained as the result of his allegedly unlawful arrest, [Doc. 85 at 1], contending that his stop and detention were "not supported by evidence rising to the level of a reasonable articulable suspicion of criminal activity," and that his "full scale arrest and seizure" were not supported by any probable cause, [id. at 3 ¶ 3]. Laster argues that all statements he made "should be suppressed because [] [he] was in legal custody," but "he was not advised of his Miranda rights before being questioned about the Nissan Sentra and his reasons for being in the grocery store parking lot," and he never voluntarily waived his rights. [Id. at 3]. The government opposes the motion, arguing that "[n]one of the actions that law enforcement took on October 9, 2021 violated Laster's constitutional rights, and none of the evidence seized, and none of the statements obtained, should be suppressed." [Doc. 95 at 4].

#### 1.   *Applicable Law*

"The Fourth Amendment of the United States Constitution guarantees '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" United States v. Adigun, Criminal Case No. 1:10–cr–00202–RWS–RGV, 2011 WL 2194253, at *15 (N.D. Ga. May 4, 2011),

adopted by 2011 WL 2198308, at *1 (N.D. Ga. June 3, 2011), aff'd, 567 F. App'x 708 (11th Cir. 2014) (per curiam) (unpublished) (alteration in original) (quoting U.S. Const. amend. IV).   "The Supreme Court has identified three distinct types of police-citizen encounters, each requiring a different level of suspicion to be deemed reasonable under the Fourth Amendment: '(1) arrest, which must be supported by probable cause; (2) brief investigatory stops, which must be supported by reasonable articulable suspicion; and (3) brief encounters between police and citizens, which require no objective justification.'"   United States v. Brown, 401 F.3d 588, 592 (4th Cir. 2005) (quoting United States v. Weaver, 282 F.3d 302, 309 (4th Cir. 2002)); see also United States v. Jordan, 635 F.3d 1181, 1185 (11th Cir. 2011); United States v. Hastamorir, 881 F.2d 1551, 1556 (11th Cir. 1989); United States v. Puglisi, 723 F.2d 779, 783 (11th Cir. 1984); United States v. Hunter, Criminal File No. 1:07-CR-310-1-TWT, 2008 WL 552881, at *3 (N.D. Ga. Feb. 25, 2008), adopted at *1.

"[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place[.]" Florida v. Bostick, 501 U.S. 429, 434 (1991) (quoting Florida v. Royer, 460 U.S. 491, 497 (1983)); see also United States v. Mendenhall, 446 U.S. 544, 553-54 (1980) (citation omitted) (stating that there is nothing in the Constitution which prevents a police officer from addressing questions to anyone on the streets); Miller v.

Harget, 458 F.3d 1251, 1257 (11th Cir. 2006) (citations omitted) ("This Court has

decided on several occasions that a police officer does not seize an individual

merely by approaching a person in a parked car."). In Bostick, the Supreme Court

held that:

> [A] seizure does not occur simply because a police officer approaches
> an individual and asks a few questions. So long as a reasonable
> person would feel free "to disregard the police and go about his
> business," the encounter is consensual and no reasonable suspicion is
> required. The encounter will not trigger Fourth Amendment scrutiny
> unless it loses its consensual nature.

501 U.S. at 434 (internal citation omitted) (quoting California v. Hodari D., 499 U.S.

621, 628 (1991)). Even if the officers have no basis for suspecting a particular

individual, "they may generally ask questions of that individual, ask to examine

the individual's identification, and request consent to search his or her [property]

– as long as the police do not convey a message that compliance with their requests

is required." Id. at 434-35 (internal citations omitted); see also United States v.

Graham, No. 2:06-cr-144-WKW, 2007 WL 2746656, at *3 (M.D. Ala. Sept. 19, 2007),

adopted at *1 (collecting cases). An individual's Fourth Amendment right is

implicated when he is no longer "free to leave." Michigan v. Chesternut, 486 U.S.

567, 573 (1988) (citation and internal marks omitted); see also United States v.

Mitchell, 407 F. App'x 407, 409 (11th Cir. 2011) (per curiam) (unpublished). "[T]o

determine whether a particular encounter constitutes a seizure, a court must

consider all of the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." Bostick, 501 U.S. at 439; see also United States v. Hunter, 373 F. App'x 973, 976 (11th Cir. 2010) (per curiam) (unpublished).

A seizure arises "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen[.]" Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968); see also Miller, 458 F.3d at 1257; United States v. Lowe, No. CR 311–001, 2011 WL 2600513, at *4 (S.D. Ga. June 16, 2011), adopted by 2011 WL 2710393, at *1 (S.D. Ga. July 12, 2011). "Some factors which 'might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" Hunter, 2008 WL 552881, at *3 (quoting Mendenhall, 446 U.S. at 554); see also United States v. Edwards, No. 1:05-cr-0097-WSD-JFK, 2007 WL 2479288, at *3 (N.D. Ga. Aug. 28, 2007). Other factors courts have considered include prolonged retention of a person's personal effects, a request to accompany the officer to the station, and whether the encounter occurred in a nonpublic place or in a small, enclosed space. United States v. Laboy, 979 F.2d 795, 799 (10th Cir. 1992)

(collecting cases).  That an officer does not specifically advise the person of his right to walk away does not elevate the encounter into a seizure absent some other evidence of coercion or restricted freedom.  United States v. Hathcock, 103 F.3d 715, 719 (8th Cir. 1997).  Additionally, an officer's unexpressed intent to detain the individual had he attempted to leave is irrelevant under the objective standard utilized in determining whether a Fourth Amendment seizure has occurred. United States v. Archer, 840 F.2d 567, 572 (8th Cir. 1988) (citing Mendenhall, 446 U.S. at 554 n.6); see also Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011); United States v. Hampton, Criminal Case No. 1:11–cr–00410–RWS–RGV, 2012 WL 1354579, at *7 (N.D. Ga. Mar. 5, 2012), adopted by 2012 WL 1354574, at *1 (N.D. Ga. Apr. 17, 2012), aff'd, 553 F. App'x 955 (11th Cir. 2014) (per curiam) (unpublished) (citations-omitted).

Therefore, "[t]he key inquiry is whether, under the totality of the circumstances, 'the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'"  Edwards, 2007 WL 2479288, at *3 (quoting United States v. Baker, 290 F.3d 1276, 1278 (11th Cir. 2002)).  "'That is, where a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter, the encounter with the police is consensual, and the Fourth Amendment is not implicated.'"  Id.  (quoting United States v. Ramirez, 476 F.3d 1231, 1238 (11th Cir.

2007)).  Thus, a consensual encounter becomes a <u>Terry</u> stop if the defendant's cooperation "is induced by 'coercive means' or if a reasonable person would not 'feel free to terminate the encounter[.]'"   <u>United States v. Wright</u>, No. 3:06cr447/MCR, 2006 WL 3483503, at *2 (N.D. Fla. Nov. 30, 2006) (citation omitted) (quoting <u>United States v. Perez</u>, 443 F.3d 772, 777-78 (11th Cir. 2006)).

An investigative stop of an individual by law enforcement, as opposed to a police-citizen encounter, triggers Fourth Amendment scrutiny.  <u>Hunter</u>, 373 F. App'x at 976.  An officer may briefly detain a person for an investigative <u>Terry</u> stop only when there exists "reasonable suspicion," based on articulable facts, that "criminal activity may be afoot."  <u>Terry</u>, 392 U.S. at 30; <u>United States v. Sokolow</u>, 490 U.S. 1, 7 (1989) (citation omitted); <u>Hunter</u>, 373 F. App'x at 976.  Officers need not have probable cause.  <u>Sokolow</u>, 490 U.S. at 7 (citation omitted) ("[T]he level of suspicion required for a *Terry* stop is obviously less demanding than that for probable cause."); <u>see also</u> <u>United States v. Blackman</u>, 66 F.3d 1572, 1576 (11th Cir. 1995); <u>United States v. Diaz-Lizaraza</u>, 981 F.2d 1216, 1220 (11th Cir. 1993).

When evaluating the propriety of an investigative stop, the Court must determine whether reasonable suspicion existed in view of the totality of the circumstances.  <u>United States v. Arvizu</u>, 534 U.S. 266, 273-74 (2002); <u>United States v. Caraballo</u>, 595 F.3d 1214, 1222 (11th Cir. 2010).  Although "the concept of reasonable suspicion is somewhat abstract," courts "have deliberately avoided

reducing it to 'a neat set of legal rules.'"  Arvizu, 534 U.S. at 274 (quoting Ornelas v. United States, 517 U.S. 690, 695-96 (1996)).  The agent must articulate some minimal, objective justification for an investigatory stop based on the totality of the circumstances and the collective knowledge of the agents involved in the encounter.  Sokolow, 490 U.S. at 7-8; see also United States v. Williams, 876 F.2d 1521, 1524 (11th Cir. 1989); United States v. Cotton, 721 F.2d 350, 352 (11th Cir. 1983); United States v. Rodriguez-Alejandro, 664 F. Supp. 2d 1320, 1334-35 (N.D. Ga. 2009), adopted at 1326.  A reasonable suspicion determination must be based on common sense judgments and inferences about human behavior.  Illinois v. Wardlow, 528 U.S. 119, 125 (2000); United States v. Cortez, 449 U.S. 411, 418 (1981); United States v. Reed, 402 F. App'x 413, 415 (11th Cir. 2010) (per curiam) (unpublished).  While the reasonable suspicion standard is not onerous, an officer's reliance on a "mere hunch" is not sufficient to establish reasonable suspicion.  Arvizu, 534 U.S. at 274 (citation omitted); see also United States v. Lopez-Garcia, 565 F.3d 1306, 1313 (11th Cir. 2009).  Mindful of these principles, the Court turns to the totality of the circumstances confronting the law enforcement officers who encountered Laster on October 9, 2020, and the reasonable inferences to be drawn therefrom.

2.    *Analysis*

The first issue to be decided is whether the initial encounter with Laster implicated the Fourth Amendment. See Hampton, 2012 WL 1354579, at *9 (citation and internal marks omitted) ("We will address the seizure argument first because the constitutional protections of the Fourth Amendment do not even come into play unless there has been a seizure.").  "[A]n officer's approach of a car parked in a public place does not constitute an investigatory stop or higher echelon Fourth Amendment seizure."  United States v. Moulton, Criminal Case No. 1:10-CR-00120-MHS-RGV, 2010 WL 6084115, at *5 (N.D. Ga. Nov. 22, 2010), adopted by 2011 WL 902639, at *1 (N.D. Ga. Mar. 14, 2011) (alteration in original) (citations and internal marks omitted); see also United States v. Graham, 323 F. App'x 793, 798 (11th Cir. 2009) (per curiam) (unpublished).  "Therefore, the mere act of approaching [Laster] in his parked car was permissible, regardless of whether the officers had reasonable suspicion of criminal activity," Graham, 323 F. App'x at 798 (citing Baker, 290 F.3d at 1279), "and here, [Agent Howard] did nothing to indicate that [Laster] was being seized or detained when [he] first approached him," Moulton, 2010 WL 6084115, at *5.  Thus, his initial conversation with Laster while he was seated in the Sentra does not even trigger a Fourth Amendment inquiry.

21

Moreover, "the fact that the officers [] blocked the vehicle [Laster] was in with their patrol cars does not transform the consensual encounter into a seizure under the Fourth Amendment," id. (citing United States v. Kim, 25 F.3d 1426, 1428, 1430-31 (9th Cir. 1994) ("finding that an officer's initial encounter with defendant, who was seated in his lawfully parked car, was not a seizure where the officer parked his car partially blocking defendant's car, approached defendant's car on foot, and asked for, and received permission to question the defendant")); see also Am. Fed'n of Labor & Congress of Indus. Orgs. v. City of Miami, 637 F.3d 1178, 1191 (11th Cir. 2011) (alteration, citation, and internal marks omitted) ("A seizure occurs whenever the police restrain the freedom of a person to walk away."); Miller, 458 F.3d at 1257 (noting that the fact that the officer parked behind the suspect and "would have prevented [the suspect] from backing [the] car out of the parking space" was not dispositive of whether suspect was detained or seized); United States v. Thompson, 546 F.3d 1223, 1228-29 (10th Cir. 2008) (finding defendant's encounter with officer consensual even though his vehicle may have been partially blocked in the parking spot); United States v. Summers, 268 F.3d 683, 687 (9th Cir. 2001) (finding interaction with defendant was consensual even where officer partially blocked defendant's vehicle stating, "[the defendant's] car was parked and was only partially blocked.  Nothing prevented him from leaving the scene on foot."); United States v. Flores-Uriostegui, Criminal Case No. 1:09–

22

cr–00438–JEC–LTW, 2012 WL 1884036, at *8 (N.D. Ga. May 22, 2012) (citations omitted) (finding defendants "were arguably not coercively detained when the officers pulled their patrol car behind defendants' vehicle"); United States v. Espinal, Criminal Case No. 1:11–CR–0060–4–ODE–RGV, 2012 WL 92451, at *2 (N.D. Ga. Jan. 10, 2012) (citation omitted) (noting that "the Eleventh Circuit has held that an individual in a parked car is not seized simply because a police officer parks his car in a way that blocks the individual from departing by car"); but see United States v. Jones, 562 F.3d 768, 772-73 (6th Cir. 2009) (finding a seizure because a reasonable person would not feel free to leave once officers had blocked his vehicle).  Thus, although patrol vehicles may have been parked in a manner that prevented Laster's vehicle from leaving, see [Doc. 95-1; Doc. 95-2], Agent Howard's initial approach to the Sentra and conversation with Laster and request for him to exit the vehicle and accompany him to the rear to talk was a consensual encounter,[8] see United States v. Drayton, 536 U.S. 199, 200 (2002); Bostick, 501 U.S.

---

[8] The mere fact that Agent Howard frisked Laster for weapons when he stepped to the rear of the vehicle and asked him to remove his hands from his pockets did not transform the encounter into a seizure.  See United States v. Broomfield, 417 F.3d 654, 656 (7th Cir. 2005); United States v. Bandy, No. 2:09–CR–125, 2009 WL 3305746, at *6 (N.D. Ind. Oct. 13, 2009) (finding encounter in an alley consensual where officer "asked [the suspect] to take his hand out of his pocket, and he complied").  There is no indication that Laster refused to remove his hands, that he acquiesced to a show of authority by Agent Howard sufficient to constitute seizure, or that he did not believe that he was free to leave.  See United States v. Adebanjo, 54 F.3d 774, at *4 (4th Cir. 1995) (per curiam) (unpublished) (finding

at 434 ("[S]eizure does not occur simply because a police officer approaches an individual and asks a few questions."); United States v. Foster, 376 F.3d 577, 581-84 (6th Cir. 2004) (finding no seizure where three uniformed officers approached defendant as he was emerging from a parked car with the engine running and asked him his name, what he was doing, and whether he had identification), but even if the encounter amounted to a Terry stop, Agent Howard had reasonable suspicion for his actions based on the information known to him from the investigation and the events he had observed prior to the encounter.

Agent Howard was among the agents conducting surveillance of the house on October 9, 2020, where earlier in the day a Yaris, occupied by two Hispanic males, had departed and made a delivery of methamphetamine to a Volvo in a grocery store parking lot in Marietta, and the agents subsequently observed a Camry, which also had been parked at the house under surveillance, depart the house occupied by two Hispanic males and drive to a grocery store parking lot in Woodstock where it parked beside the Sentra in which Laster was seated as the driver. [Doc. 88-1 at 5, 13-14]. When Agent Howard approached the driver of the Camry, he observed the passenger was holding a plastic grocery bag in his lap that

---

defendant was not seized when asked to remove his hand from his jacket since he "was free to leave; his movement was not restricted, nor was his liberty retrained); see also United States v. Roberts, No. 2:06-cr-0280-RCJ-PAL, 2007 WL 1381776, at *18 (D. Nev. May 9, 2007), aff'd, 326 F. App'x 436 (9th Cir. 2009) (unpublished).

Agent Howard suspected contained methamphetamine.  [Id. at 14].  HSI Agents Cwieka and Everhart approached the passenger side of the Camry and immediately saw another bag on the front passenger floorboard between the passenger's feet that they recognized contained methamphetamine.  [Id.].  When Agent Howard approached Laster to ask about his suspicion that he was involved in a drug transaction, Laster denied it and said that he did not know the passenger seated in the Sentra with him and had just stopped to ask him for directions.  [Id.].  The totality of the circumstances, including the drug transaction that had occurred earlier that day and Laster's dubious explanation of why he was seated in the Sentra with an individual he did not know parked next to the Camry in which suspected methamphetamine had been seized, supplied reasonable suspicion for Agent Howard to investigate Laster's possible involvement in an attempted drug transaction.  Thus, the encounter with Laster and subsequent "stop was justified at least by reasonable suspicion."   United States v. Pineda-Zuniga, CRIMINAL CASE NUMBER: 1:16-CR-00323-2-LMM-JSA, 2017 WL 9477640, at *5 (N.D. Ga. Aug. 18, 2017), adopted by 2017 WL 4074785, at *3 (N.D. Ga. Sept. 14, 2017) (footnote and citations omitted); see also United States v. Nunez, 455 F.3d 1223, 1226 (11th Cir. 2006) (per curiam) (finding stop was based on reasonable suspicion since defendant was seen entering a house known to contain a marijuana growing operation and subsequently left with a garbage bag); United States v. Khan,

CRIMINAL CASE NO. 1:17-CR-0040-SCJ, 2018 WL 2214813, at *7 (N.D. Ga. May 15, 2018), adopted in part by 2018 WL 2214813, at *9 (N.D. Ga. May 15, 2018) (citation omitted) (finding officers had probable cause to stop vehicle where "prior to the traffic stop of [d]efendant's car, [the] [t]rooper [] had been contacted by the DEA and was told that someone would be bringing Spice (synthetic marijuana); that on the date in question, [he] was on stand-by at the DEA's request; that [he] had a DEA radio mounted in his car; that the DEA was communicating with [him] by radio on the day of the [d]efendant's traffic stop; and that [he] knew what was happening via the updates over the DEA radio").  Accordingly, Agent Howard had, at a minimum, reasonable suspicion to detain Laster for an investigative stop based on the methamphetamine trafficking investigation and the events that transpired on October 9, 2020.[9]  See United States v. Patton, Case No. 15-20246, 2018 WL 3370545, at *7 (E.D. Mich. July 10, 2018) (finding that the "DEA had at

---

[9] In fact, before encountering Laster, the agents had established probable cause to obtain a search warrant for the house under surveillance in Marietta as well as the Yaris that made the drug delivery to the Volvo and the Camry that was parked next to the Sentra in which Laster was seated based on the events that had transpired earlier that day and during their prior investigation.  See [Doc. 88-1 at 5]; United States v. Senese, Case No. 18-cr-60076-BB, 2018 WL 3159733, at *7 (S.D. Fla. June 28, 2018), aff'd, 798 F. App'x 499 (11th Cir. 2020) (per curiam) (unpublished); see also United States v. Gibson, 708 F.3d 1256, 1278 (11th Cir. 2013) (citation and internal marks omitted) ("To obtain a warrant, police must establish probable cause to conclude that there is a fair probability that contraband or evidence of a crime will be found in a particular place.").

least reasonable suspicion to stop and search the vehicle, based on the reliability of the confidential informant, the level of detail provided by the informant, and the independent corroboration of the tip," which included electronic surveillance and geo-location information pertaining to a phone).

Where an officer initiates a legal stop, he has "the duty to investigate suspicious circumstances that then [come] to his attention." United States v. Cantu, 227 F. App'x 783, 785 (11th Cir. 2007) (per curiam) (unpublished) (alteration in original) (citation and internal marks omitted). However, the ensuing detention of a vehicle's occupant must not be excessively intrusive in that the officer's actions "must be reasonably related in scope to the circumstances which justified the interference in the first place." United States v. Boyce, 351 F.3d 1102, 1106 (11th Cir. 2003) (quoting Terry, 392 U.S. at 20); see also United States v. Cantu, 227 F. App'x 783, 785 (11th Cir. 2007) (per curiam) (unpublished). Although "[t]here is no rigid time limitation or bright line rule regarding the permissible duration of a Terry stop," United States v. Williams, 238 F. App'x 566, 568 (11th Cir. 2007) (per curiam) (unpublished) (alteration in original) (citation and internal marks omitted), the duration of the stop "must be limited to the time necessary to effectuate the purpose of the stop," United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001). The legality of a detention following a stop may be jeopardized if an officer improperly extends its duration. United States v. Hernandez, 418 F.3d

1206, 1209 n.3 (11th Cir. 2005) (in light of <u>Muehler v. Mena</u>, 544 U.S. 93, 100-01 (2005), proper focus is on the duration, not the scope of questioning).

An officer may prolong a stop when, among other reasons, the officer has "'articulable suspicion of other illegal activity.'"   <u>Boyce</u>, 351 F.3d at 1106 & n.3 (quoting <u>Purcell</u>, 236 F.3d at 1277-78).  Agent Howard had "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant[ed] the investigatory detention," and he was thus justified in prolonging the stop of Laster.  <u>United States v. Richardson</u>, No. CR 108–151, 2009 WL 668706, at *3 (S.D. Ga. Mar. 12, 2009), adopted at *1 (citations omitted); <u>see also</u> <u>United States v. Acosta</u>, 807 F. Supp. 2d 1154, 1198-99 (N.D. Ga. 2011) (finding officer's stop of tractor trailer and subsequent request for consent to search was based on reasonable suspicion where the FBI had advised him that as part of an investigation into drug trafficking, they believed a load of narcotics was coming to Atlanta in a tractor trailer; that the FBI pointed out the tractor trailer as the one suspected of transporting narcotics; and that after the stop, the paperwork "was vague," among other things); <u>United States v. Garcia-Aleman</u>, No. 1:10-CR-29, 2010 WL 2635071, at *1 (E.D. Tex. June 9, 2010), adopted by 2010 WL 2635073, at *1 (E.D. Tex. June 30, 2010) (citations omitted) ("[I]f additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, the detention may continue until the new reasonable suspicion has been

dispelled or confirmed.").  In fact, "the brief detention was a reasonable response to the totality of the circumstances," United States v. Ellis, 497 F.3d 606, 614 (6th Cir. 2007), and Agent Howard "diligently pursued a means of investigation that was likely to confirm or dispel his suspicions as quickly as possible," United States v. Johnson, No. CR05-4063-MWB, 2005 WL 2704892, at *6 (N.D. Iowa Oct. 20, 2005).

Agent Howard initially attempted to confirm or dispel his suspicion that Laster was attempting to engage in a drug transaction by simply conversing with Laster, who was still seated in his vehicle.  [Doc. 88-1 at 14; Doc. 95-2 at 00:01-01:12].  Agent Howard asked him to step out of the Sentra for further conversation at the rear of the vehicle while other investigation continued at the scene.  [Doc. 95-2 at 01:12-01:17].  Agent Howard asked for consent to search the vehicle, but Laster declined, [id. at 04:07-04:15], so Agent Howard requested that a drug detection dog come to the scene, [id. at 04:17-04:27], and a Cherokee County K-9 officer arrived approximately 25 minutes after Agent Howard had first approached Laster.  [Doc. 95-1 at 23:30].  The K-9 alerted to the presence of narcotics odor from within the Sentra, [Doc. 88-1 at 14; Doc. 95-1 at 26:15-27:05], and the individual who had been seated in the passenger seat of the vehicle with Laster told agents that Laster was in the parking lot to buy $21,000 of drugs from the occupants of the Camry.  [Doc. 88-1 at 6, 14-15].  Laster was not handcuffed or otherwise physically restrained during the entire stop until approximately 50

minutes after Agent Howard had first approached him when he was then handcuffed and subsequently formally placed under arrest.[10]  [Doc. 95-1 at 44:15-52:55].   Under the totality of these circumstances, the <u>Terry</u> stop was not unreasonable.  <u>See</u> <u>United States v. Gil</u>, 204 F.3d 1347, 1350-51 (11th Cir. 2000) (per curiam) (finding seventy-five minute <u>Terry</u> stop reasonable); <u>United States v. Cooper</u>, 873 F.2d 269, 275 (11th Cir. 1989) (per curiam) (finding thirty-five minute reasonable suspicion detention reasonable); <u>United States v. Hardy</u>, 855 F.2d 753, 761 (11th Cir. 1988) (finding <u>Terry</u> stop lasting almost fifty minutes reasonable). Since the agents conducted a lawful <u>Terry</u> stop and Laster was not in custody during their investigation at the scene where he stood unrestrained in a public parking lot near his vehicle, <u>Miranda</u> warnings were not required, and the statements he made up to the point that he was handcuffed and arrested are not subject to suppression.  <u>See</u> <u>United States v. Acosta</u>, 363 F.3d 1141, 1149-50 (11th Cir. 2004); <u>United States v. Hines</u>, Criminal Case No. 1:12–CR–79–SCJ, 2013 WL 6086151, at *8 (N.D. Ga. Nov. 19, 2013), adopted at *5 (finding officers were not

---

[10] Laster's motion to suppress erroneously asserts that after he was "ordered . . . out of the car," he was "immediately cuffed, secured, and placed into a police vehicle," [Doc. 85 at 2 ¶ 2], but the body-worn video camera footage of the encounter conclusively refutes this assertion, <u>see</u> [Docs. 95-1 & 95-2], and Laster's counsel acknowledged during the telephone conference on May 14, 2021, that he misstated that Laster was immediately cuffed, <u>see</u> [Doc. 94 at 18-19].

required to provide <u>Miranda</u> warning prior to questioning defendant while he was "in an investigative detention").[11]  Furthermore, the agents had probable cause to arrest Laster for methamphetamine trafficking by attempting to possess the methamphetamine seized from the Camry based on their investigation of similar transactions involving the delivery of methamphetamine to a car in a parking lot by vehicles that departed a suspected stash house in Marietta coupled with the K-9 alert on the Sentra he was driving and the statement by the individual seated with him in the vehicle implicating Laster in the attempted purchase of the seized methamphetamine.   Consequently, Laster's motion to suppress statements he made during the lawful encounter leading up to his arrest on October 9, 2020, [Doc. 85], is without merit and due to be **DENIED**.

---

[11] Moreover, the absence of coercive influences on Laster indicates that his statements were voluntarily made.  <u>See</u> <u>Colorado v. Connelly</u>, 479 U.S. 157, 168 (1986).  Laster "was not questioned or detained for a lengthy period, he was not subject to unkind physical conditions, up until the point of his arrest, he was not handcuffed, subjected to the use of force, or otherwise subjected to police intimidation, and based upon his answers to police questions, he appeared to be lucid and did not appear to lack intelligence," and thus, "based on the totality of the circumstances, [his] statements were voluntarily made."   <u>United States v. Walton</u>, Criminal Action No. 1:12–CR–395–CAP, 2014 WL 3519176, at *13 (N.D. Ga. July 15, 2014), adopted at *1; <u>see also</u> <u>United States v. Bhatt</u>, 160 F. Supp. 3d 1359, 1361-62, 1364-65 (N.D. Ga. 2016) (finding defendant's statements made over the course of nearly three hours in the presence of 12 to 13 armed law enforcement officers voluntary in light of applicable law).

**C.**    **Motion to Suppress Evidence, [Doc. 86]**

Laster moves to suppress all evidence obtained as a result of the search of the Nissan Sentra he was driving on October 9, 2020, [Doc. 86 at 1], arguing that the warrants obtained to search the Sentra were tainted by his unlawful arrest and also not supported by an affidavit establishing sufficient probable cause, [id. at 3-4]. The government responds that the search of the Nissan Sentra was supported by probable cause and not tainted by Laster's lawful stop and detention. [Doc. 95 at 7]. Since the Court has concluded that the agents lawfully stopped, detained, and arrested Laster, his argument that the search warrant for the Sentra was tainted by the "fruit of the poisonous tree" of an unlawful arrest fails, United States v. Goldenshtein, Criminal Case No. 1:10–CR–00323–TCB–RGV, 2011 WL 1321573, at *13 (N.D. Ga. Feb. 22, 2011), adopted by 2011 WL 1257147, at *1 (N.D. Ga. Apr. 1, 2011), and the Court will address only his contention that the affidavit for the October 9, 2020, search warrant failed to establish probable cause.[12]

---

[12] The Court need not address the search warrant for the Sentra obtained on October 19, 2020, [Doc. 88-2 at 34], since it is undisputed that no evidence was seized based on that warrant, [id. at 7]; see also United States v. Kilgore, Criminal Case No. 1:11–cr–00518–CAP–RGV, 2012 WL 5334298, at *6 (N.D. Ga. Sept. 13, 2012), adopted by 2012 WL 5305146, at *1 (N.D. Ga. Oct. 26, 2012); Hardy v. United States, Nos. 1:08–CV–90027 WLS, 1:05–CR–22 WLS, 2008 WL 8126040, at *3 (M.D. Ga. Oct.14, 2008), adopted by 2010 WL 4260212, at *3 (M.D. Ga. Oct. 21, 2010), aff'd, United States v. Hardy, 240 F. App'x 408 (11th Cir. 2007) (unpublished) (citation omitted) (Even "[a]ssuming arguendo that there was an illegal search of the vehicle,

Laster presents a facial challenge to the validity of the search warrant, and the standard of review on such a challenge is a deferential one.  <u>United States v. Miller</u>, 24 F.3d 1357, 1363 (11th Cir. 1994).  The Eleventh Circuit has summarized the essence of the Court's review as follows:

> When called upon by law enforcement officials to determine the legitimacy of search warrants and their supporting affidavits, issuing magistrates and reviewing courts alike must strike a delicate balance between constitutional guarantees against excessive intrusions into areas of individual freedom and the Government's need to access and to secure relevant evidence in criminal prosecutions.  In particular, issuing magistrates are given the unenviable task of making "firing line" decisions that attempt to encourage availment of the warrant process while simultaneously striving to protect citizens from unwarranted governmental interference.   In recognition of the difficulty inherent in discharging this responsibility, reviewing courts lend substantial deference to an issuing magistrate's probable cause determinations.

<u>Id.</u>  "In attempting to ensure that search warrant affidavits comply with the Fourth Amendment's prohibition against unreasonable searches and seizures resultant from warrants issued without probable cause, the issuing magistrate 'is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit . . . , there is a fair probability that contraband or evidence of a crime will be found in a particular place."  <u>Id.</u> at 1361 (alteration in original) (quoting <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983)); <u>see also</u> <u>United States v.</u>

---

nothing was seized which could have constituted 'fruit of the poisonous tree' to be suppressed").

Betancourt, 734 F.2d 750, 754 (11th Cir. 1984) (citation and internal marks omitted) ("[P]robable cause exists if facts within the magistrate's knowledge and of which he had reasonably trustworthy information would warrant a man of reasonable caution in the belief that a crime was committed and that evidence is at the place to be searched.").

"[P]robable cause deals 'with probabilities.  These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'"  Gates, 462 U.S. at 241 (quoting Brinegar v. United States, 338 U.S. 160, 175 (1949)); see also Adams v. Williams, 407 U.S. 143, 149 (1972.  "Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations."  Miller, 24 F.3d at 1361 (citation omitted).  Furthermore, "the fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause."  United States v. Fama, 758 F.2d 834, 838 (2d Cir. 1985) (citations omitted); see also Adams, 407 U.S. at 149 (citation omitted).

The affidavit presented to obtain the search warrant for the Sentra on October 9, 2020, described details of the investigation leading up to the encounter

34

with Laster in the parking lot, including the drug transaction that occurred earlier that same day between the Yaris and Volvo at a grocery store parking lot in Marietta as well as an undercover drug buy the preceding month during which the Camry that was parked beside Laster's Sentra on October 9, 2020, made the delivery of drugs to the undercover agent's car in a parking lot along Canton Road in Marietta, using a similar modus operandi to make the delivery.  [Doc. 88-1 at 11-14].  The affidavit also detailed the surveillance that had been conducted at the house from which the Yaris and Camry departed on October 9, explaining that it appeared to be a stash house from which deliveries of methamphetamine were made based on the activities observed and the seizures made on that day.  [Id. at 12-13].  The affidavit also summarized Agent Howard's encounter with Laster in the parking lot after the seizure of methamphetamine from the Camry that was parked next to the Sentra, including the K-9 alert on Laster's vehicle and the conflicting statements Laster and his passenger made about the reason they were seated together in the Sentra, and the passenger's subsequent statement implicating Laster in the attempted drug deal.  [Id. at 14].  As the government points out, "the search warrant application presented a plethora of facts, including but not limited to the admission of Laster's passenger, which established that Laster was engaged in a drug transaction from within the Nissan Sentra when agents interceded." [Doc. 95 at 7 (citation omitted)].  The

totality of the circumstances presented in the affidavit, when taking a "realistic and commonsense approach" and not viewing the affidavit in a "hypertechnical manner," established probable cause for the search of the Sentra.  United States v. Robinson, 62 F.3d 1325, 1331 n.9 (11th Cir. 1995) (alteration in original) (citation and internal marks omitted) ("[O]pinions and conclusions of an experienced agent regarding a set of facts are properly a factor in the probable cause equation for issuing a search warrant.").[13]   Therefore, Laster's motion to suppress evidence seized from the Sentra, [Doc. 86], is without merit and due to be **DENIED**.

### III.  CONCLUSION

For the foregoing reasons, Laster's motion to show cause of delay, [Doc. 87], is **DENIED**, and it is **RECOMMENDED** that his motions to suppress statements and evidence, [Docs. 85 & 86], be **DENIED** as untimely, and alternatively, for lack of merit.

---

[13] Moreover, as the government correctly contends, the "K-9's alert to the presence of a trained odor immediately justified a warrantless search (even though the agents opted to obtain a search warrant)."  [Doc. 95 at 7 (citing United States v. Tamari, 454 F.3d 1259, 1264-65 (11th Cir. 2006) (alterations in original) (internal marks omitted) ("[T]he automobile exception permits warrantless vehicle searches if the vehicle is operational and agents have probable cause to believe the vehicle contains evidence of a crime . . . . We have long recognized that probable cause arises when a drug-trained canine alerts to drugs."); United States v. Gbemisola, 225 F.3d 753, 758 (D.C. Cir. 2000) ("where exception to warrant requirement applies, invalidity of superfluous warrant is immaterial"))].

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED** and **RECOMMENDED**, this 16th day of July, 2021.

*Russell G. Vineyard*
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE